Constance WELLS, et al., Plaintiffs,

v.

CITY OF DAYTON, et al., Defendants.

No. 3:04cv220.

United States District Court,
S.D. Ohio,
Western Division.

Nov. 21, 2006.

Cheryl Renee Washington, Taylor Jones, Jr., Jones & Washington Co., L.P.A., Dayton, OH, for Plaintiffs.

Leonard J. Bazelak, Neil Frank Freund, Freund Freeze & Arnold, Dayton, OH, for Defendants.

EXPANDED OPINION SETTING FORTH THE REASONING AND CITATIONS OF AUTHORITY WHICH SUPPORT THE COURT'S DECISION OF MARCH 24, 2006 (DOC. # 71), TO SUSTAIN IN PART AND TO OVERRULE IN PART THE MOTION FOR SUMMARY JUDGMENT (DOC. # 17) FILED BY DEFENDANTS CITY OF DAYTON, WILLIAM MCMANUS, CHRISTOPHER CORNWELL AND STEVEN MCCALL

RICE, District Judge.

On the evening of May 23, 2003, Defendant Shawn Robinson ("Robinson") attended a cookout at his father's residence, after which he returned to his residence in an apartment building located at 104 Central Avenue, Dayton, Ohio.[1] After that party, during the early morning hours of May 24, 2003, Robinson held a handgun to the head

---

1. Since this case comes before the Court on a Motion for Summary Judgment filed by a

of April Smith ("Smith"), also a tenant in that apartment building. Smith, in turn, called the Dayton Police Department. As a result of that telephone call, Defendant Christopher Cornwell ("Cornwell"), a police officer employed by Defendant City of Dayton ("Dayton"), was dispatched to the apartment building located at 104 Central Avenue.

During the evening of the 23rd and the early morning hours of the 24th, Harold Lee Wells, Jr. ("Wells"), was out with his friend, Bernard Veney ("Veney"), and Gregory West ("West"), an acquaintance of Veney. At some point during the evening, West convinced his companions to accompany him to Robinson's residence. When Wells, West and Veney arrived at the apartment located at 104 Central Avenue, one of them rang a buzzer, in order for them to be admitted to the building. They then went to Robinson's apartment, without knowing that he had earlier placed a firearm to Smith's head or that police were responding to that location as a result of Robinson's actions in that regard. Wells and Veney sat on a couch in the living room of that apartment, while West went into the kitchen.[2]

Upon arriving at 104 Central Avenue, Cornwell met with Smith outside that apartment building. Smith told the officer that Robinson had put a gun to her head and asked where "L" was and that, after she had told Robinson that she did not know, he had left and gone inside his apartment. Smith also told Cornwell that Robinson had drugs and guns inside his apartment and that he was drunk and needed to be stopped. After having talked to Smith and before entering the apart-

ment building at 104 Central Avenue, Cornwell contacted Defendant Steven McCall ("McCall"), another Dayton police officer, and asked McCall to join him outside that building.

After McCall had arrived, the two officers followed Smith into the apartment building and proceeded to Robinson's apartment. Having been told that Robinson was armed and knowing that the apartment building at 104 Central Avenue was located in an intermediate to high drug area, each officer took a position on either side of the door to Robinson's apartment, so that neither could be seen by anyone looking out of the peephole in that door.[3] While they were so standing, the officers drew their weapons and pointed them toward the door. After listening at the door for a few minutes and hearing multiple male voices inside, McCall motioned to Cornwell to knock on the door, and the latter knocked on it a number of times, softly. When he knocked on the door, Cornwell moved into a position where he could be seen if the door were opened, but remained out of the view of anyone peering out of the peephole. Although no one answered the door, the apartment grew quieter, and the officers could hear someone therein ask the other occupants whether they had heard a knock on the door.

After waiting a brief period of time, Cornwell knocked on the door again, although more loudly. Cornwell heard someone inside ask, using language laden with expletives, why the person knocking could not stand in front of the door. Robinson then opened the door and shot Cornwell,[4] striking his body armor in the area

number of the Defendants, the Court sets forth the facts and circumstances in the manner most favorable to the Plaintiffs, against whom summary judgment is sought.

2. The living room was the room one would enter when walking into the apartment.

3. Both McCall and Cornwell were dressed in their police uniforms.

4. After firing the shot, Robinson partially

of the upper part of his stomach and lower part of his chest, causing him to fall backward. The bullet did not penetrate Cornwell's body armor. As he fell backwards, Cornwell reported on his radio that shots had been fired and that he had been shot.

After Robinson had shot Cornwell, McCall attempted to look into the apartment through the partially open door, by using a technique referred to as a "cutting the pie maneuver." That maneuver permitted McCall to ease himself around, in order to look inside the apartment, without leaving a safe position of concealment. Cornwell, in contrast, was not able to see into the apartment from his position after being shot. McCall then pushed the door open all the way. As he was standing up and moving to his left into the doorway, where he could see into the apartment, Cornwell saw an individual standing next to a couch in the living room. Wells was that individual. He had stood up from the couch when Robinson had shot Cornwell. As he stood in the living room of the apartment, Wells did not present a risk of harm to either officer or to anyone else. His hands were empty and were outside of his pockets. He did not possess a weapon, nor did he move or approach Cornwell in a threatening manner or otherwise. He made no threatening gestures. Nor did he say anything which could have caused Cornwell to fear for his or anyone else's safety. Nevertheless, Cornwell fired two shots at Wells, killing him.[5] About five seconds passed between the time that Robinson shot Cornwell and Cornwell shot Wells;[6] only about one second passed between the time that Cornwell entered the doorway to the apartment and he shot Wells. Wells had been in the apartment less than 10 minutes before being shot.

Plaintiffs initiated this lawsuit in the Common Pleas Court for Montgomery County, Ohio, from whence Defendants removed it on the basis of federal question jurisdiction.[7] See 28 U.S.C. §§ 1331 and 1441. The Plaintiffs bring this action, seeking compensation from Dayton, William McManus ("McManus"),[8] Cornwell, McCall and Robinson for the losses they (Plaintiffs) allege to have sustained as a result of Wells being shot.[9] In their Complaint,[10] the Plaintiffs have set forth eight

closed the door, ran to the back of his apartment and escaped out of a window. Given the partial closure of the door, neither Cornwell nor McCall was aware that Robinson had fled from his apartment.

5. It bears emphasis that the Defendants have presented evidence that paints a drastically different picture of the fatal confrontation between Cornwell and Wells. However, in ruling on any motion for summary judgment, this Court is compelled to construe the evidence in the manner most favorable to the nonmoving party, in this instance, the Plaintiffs. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Rainer v. Union Carbide Corp.*, 402 F.3d 608, 614 (6th Cir. 2005).

6. McCall was not in a position to observe the fatal confrontation between Cornwell and Wells.

7. The Plaintiffs are the Administrator of Wells' Estate and his three minor children who survived him.

8. McManus was the Chief of the Dayton Police Department at the time the events giving rise to this litigation occurred.

9. The Plaintiffs have joined Robinson as a Defendant. Although he testified during his deposition that he has been served in this litigation, Robinson has not filed an answer or otherwise entered an appearance.

The Plaintiffs initially joined Sergeant Gary White of the Dayton Police Department as a Defendant. The parties subsequently stipulated to his dismissal. See Doc. # 9.

10. A copy of Plaintiffs' Complaint is attached to the Notice of Removal (Doc. # 1).

claims for relief, to wit: 1) a claim against Dayton, McManus, Cornwell and McCall, predicated upon the allegation that Cornwell used excessive force to seize Wells, in violation of the Fourth Amendment (First Claim for Relief);[11] 2) a negligence claim against Shawn Robinson (Second Claim for Relief); 3) a claim against all Defendants that Wells suffered physical pain and emotional distress as a result of the Defendants actions (Third Claim for Relief); 4) a claim against Dayton and McManus, alleging that they are liable as a result of a pattern or practice of encouraging, tolerating and ratifying the use of excessive force through the failure to discipline or prosecute police officers who previously used excessive force and the failure to investigate such previous incidents (Fourth Claim for Relief); 5) a claim of assault and battery against Cornwell (Fifth Claim for Relief); 6) a claim against Dayton, McManus, Cornwell and McCall under 42 U.S.C. § 1983, apparently predicated upon their First and Fourth Claims for Relief; 7) a wrongful death claim under § 2125.01 of the Ohio Revised Code, against Dayton, McManus, Cornwell and McCall (Seventh Claim for Relief); and 8) a claim for punitive damages against all Defendants (Eighth Claim for Relief).

In its Decision of March 24, 2006 (Doc. # 71), this Court sustained in part and overruled in part the Motion for Summary Judgment (Doc. # 17) filed by Dayton, Mc-

Manus, Cornwell and McCall. In this Expanded Opinion, the Court sets forth the reasoning and citations of authority which support that Decision. The Court begins by reviewing the familiar standards which must be applied, whenever it rules upon a motion requesting summary judgment.

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Of course, the moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548. *See also Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial.") (quoting *Gutierrez v. Lynch,* 826 F.2d

---

11. Plaintiffs phrase this claim in terms cruel and unusual punishment and summary punishment and state that they are relying on of the use of excessive force in violation of the Eighth Amendment. The Court analyzes this claim under the Fourth Amendment, because the Eighth Amendment is applicable only after a person has been convicted. *Ingraham v. Wright,* 430 U.S. 651, 671, n. 40, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (noting that "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions"). *See also,*

*Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (holding that all claims of excessive force used in the context of a seizure are to be analyzed solely under the reasonableness standard of the Fourth Amendment, rather than under an Eighth Amendment or a substantive due process claim under the Fourteenth Amendment); *Smith v. Freland,* 954 F.2d 343, 346 (6th Cir.1992) (same). Indeed, the Plaintiffs concede that their excessive force claim is predicated upon the Fourth Amendment, alone. *See* Doc. # 25 at 17.

1534, 1536 (6th Cir.1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law. Fed.R.Civ.P. 50). *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). *See also Michigan Protection and Advocacy Service, Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir.1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, to-gether with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir.1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all *reasonable* inferences in the favor of that party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990). *See also L.S. Heath & Son, Inc. v. AT & T Information Systems, Inc.*, 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n. 7 (5th Cir.), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment...."). Thus, a court is entitled to rely, in determining whether a

genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

Dayton, McManus, Cornwell and McCall seek summary judgment on all claims set forth against them by Plaintiffs. As a means of analysis, the Court will initially address the individual Defendants' requests for summary judgment, following which it will turn to the parties' arguments concerning the request for summary judgment by the City of Dayton.

### 1. Request for Summary Judgment by McManus

It is uncontroverted that McManus was the Chief of the Dayton Police Department when the events giving rise to this litigation occurred. The Plaintiffs seek to impose liability upon McManus, based upon his status as the supervisor of Cornwell and McCall, rather than upon his involvement in those events. Indeed, the Plaintiffs have not cited any evidence which raises an inference that McManus was in any manner involved in the incident giving rise to this litigation. In opposing McManus's request for summary judgment, the Plaintiffs have argued only that Cornwell was not adequately trained. *See* Doc. # 25 at 18–20. With this overview in mind, the Court initially discusses the federal law claim against McManus, a claim under § 1983, following which it turns to Plaintiffs' state law claims against that Defendant.

■ In *Turner v. City of Taylor*, 412 F.3d 629 (6th Cir.2005), the Sixth Circuit reviewed the standards which must be applied to determine whether a supervisory employee, such as McManus, can be held liable under § 1983 for the constitutional actions of the employees he supervises:

This Court has explained the standards for supervisory liability under § 1983 as follows:

[T]he § 1983 liability of supervisory personnel must be based on more than the right to control employees. Section 1983 liability will not be imposed solely upon the basis of respondeat superior. There must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.

*Bellamy v. Bradley,* 729 F.2d 416, 421 (6th Cir.1984) (citing *Hays v. Jefferson County,* 668 F.2d 869, 872–74 (6th Cir. 1982)); *see also Mills v. City of Barbourville,* 389 F.3d 568, 580 (6th Cir.2004) ("In order to establish liability pursuant to § 1983, the plaintiff must prove that the defendant, as a supervisory official, is *personally* responsible for the alleged unconstitutional actions that caused his injury.... At a minimum, the plaintiff must demonstrate that a supervisory official condoned, encouraged, or knowingly acquiesced in the alleged unconstitutional misconduct.") (emphasis added in *Mills;* citing *Bellamy,* 729 F.2d at 421); *Bass v. Robinson,* 167 F.3d 1041, 1048 (6th Cir.1999) (holding that § 1983 plaintiff must prove that officer "did more than play a passive role in the alleged violation or showed mere tacit approval of the goings on.... Supervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act ... and cannot be based upon simple negligence.") (citing *Leach v. Shelby County Sheriff,* 891 F.2d 1241, 1246 (6th Cir.1989)).

*Id.* at 643. Herein, the Plaintiffs have failed to point to any evidence which would raise an inference that McManus implicitly authorized, approved, condoned, encouraged or knowingly acquiesced in Cornwell's allegedly unconstitutional misconduct. Accordingly, Defendant McManus is entitled to summary judgment on Plaintiffs' federal law, § 1983 claim.

■ In opposing the motion seeking summary judgment as it relates to their state law claims, the Plaintiffs have not expressly mentioned McManus. *See* Doc. # 25 at 34–36. Nevertheless, the Plaintiffs have requested that the Court overrule that motion in its entirety, as it relates to their state law claims. *Id.* Simply stated, McManus is entitled to summary judgment on Plaintiffs' state law claims, as Plaintiffs have not pointed to anything done by McManus which serves as the basis of imposing liability upon him. Plaintiffs are attempting to impose liability upon McManus for the allegedly tortious behavior of Cornwell and McCall. Although it is axiomatic that an employer is liable for the torts of its employees,[12] McManus was the ultimate supervisor of Cornwell and/or McCall, rather than being their employer.[13] Not surprisingly, there is a paucity of Ohio authority, indicating that a supervisor is not vicariously liable for the torts committed by the employees he supervises.[14] In *Spotts v. Columbus*

*Public Schools,* 1990 WL 48900 (Ohio App. 1990), the Franklin County Court of Appeals noted that, at common law, a supervisor such as a school principal was not vicariously liable for the torts committed by the employees that he supervised, such as teachers. Therefore, a basis does not exist in Ohio law for imposing liability upon McManus, merely because two employees over whom he was the ultimate supervisor are alleged to have committed torts.

Accordingly, the Court sustains the branch of the Motion for Summary Judgment filed by Dayton, McManus, Cornwell and McCall (Doc. # 17), with which they seek summary judgment on Plaintiffs' claims against McManus under both federal and state law.

2. *Request for Summary Judgment by McCall*

In opposing McCall's request for summary judgment, Plaintiffs rely upon the affidavit of Thomas Aveni ("Aveni"), whom they have identified as an expert witness, to argue that the evidence raises a genuine issue of material fact.[15] In his affidavit, Aveni initially focuses upon the actions of Cornwell and McCall before the confrontation at Robinson's apartment. For instance, he states that Cornwell and McCall "engaged in a course of conduct that they knew or should have known would precipi-

---

**12.** *See e.g., Linder v. Am. Natl. Ins. Co.,* 155 Ohio App.3d 30, 38, 798 N.E.2d 1190, 1196 (2003) (noting that the "doctrine of respondeat superior states that an *employer* is liable for an *employee's* torts if the *employee* committed the tort in the scope of his employment") (emphasis added); *Tucker v. The Kroger Co.,* 133 Ohio App.3d 140, 147, 726 N.E.2d 1111, 1116 (1999) (same).

**13.** The Dayton Police Department has been established by § 70 of the City of Dayton Charter, which authorizes the municipality, rather than its chief of police, to employ police officers. Consequently, the Plaintiffs

have alleged that Cornwell and McCall were employed by Dayton. Plaintiffs' Complaint at ¶ 8. They do not contend that McManus employed those two Defendants.

**14.** There is no authority, however, to support the opposite, to wit: that a supervisor *is* vicariously liable for the torts committed by the employees he supervises.

**15.** In ¶ 2 of his affidavit, Aveni states that a current version of his Curriculum Vitae is attached thereto. However, no such document has been filed.

tate a violent and deadly confrontation." Aveni Aff. at ¶ 4. He also states that, contrary to established police procedures, Cornwell and McCall failed to identify themselves when they knocked on the door to Robinson's apartment and stood where they could not be seen through the door's peephole. *Id.* at ¶ 5. Those shortcomings were, according to Aveni, "a major tactical error [sic]." *Id.* With regard to events which occurred after Cornwell had been shot by Robinson, Aveni states that the proper procedure would have been for Cornwell and McCall to have treated the situation as a hostage incident and, thus, to call for additional backup and to secure the points of entry to the apartment, while waiting for backup to arrive. *Id.* at ¶ 6. Aveni also indicates that it was improper for Cornwell and McCall to attempt to enter Robinson's apartment, after Cornwell had been shot, because of the absence of sufficient police presence and the fact that the shooting would cause Cornwell to overreact to anything he saw when he entered that apartment. *Id.* at ¶ 7. *See also, Id.* at ¶ 9 ("The actions of [Cornwell and McCall] were reckless antecedents that needlessly placed themselves and others in harm's way and led to an unreasonabl[e] use of deadly force").

McCall seeks summary judgment on Plaintiffs' state and federal law claims against him. As a means of analysis, the Court will discuss the parties' arguments in support of and in opposition to McCall's request for summary judgment on the federal claim, following which it will turn to their arguments pertaining to Plaintiffs' state law claims against McCall.

■ The Plaintiffs have set forth a claim under § 1983, alleging that McCall violated the Fourth Amendment, as a result of the excessive force that was used to seize Wells. As is noted above, however, McCall did not seize Wells, much less use excessive force to accomplish that end.

Nevertheless, Plaintiffs contend that the information contained in Aveni's affidavit raises a genuine issue of material fact on their claim against McCall, predicated upon the alleged unconstitutional use of excessive force to seize Wells. Since the alleged shortcomings of McCall, identified by Aveni, would not, if established, constitute violations of the Fourth Amendment, this Court concludes the evidence fails to raise such a genuine issue of fact.

In their memorandum opposing the request for summary judgment, the Plaintiffs argue that it is appropriate to consider actions of officers which lead to the need to use deadly force, when deciding whether the use of same violated the Fourth Amendment. *See* Doc. # 25 at 15 (citing *Allen v. Muskogee,* 119 F.3d 837 (10th Cir.1997)). Thus, Plaintiffs argue:

> Plaintiffs' expert has set forth his opinion that the death of Harold Lee Wells, Jr., was directly attributable to the official misconduct of *both* officers Christopher Cornwell and Stephan McCall of the Dayton Police Department. [Aveni Aff. at ¶ 6]. It is of no consequence that Officer McCall did not fire the weapon that gunned down Decedent Wells.

> Further, Plaintiffs dispute Defendants' contention that Officer McCall was not in a position to act in a manner that this tragic shooting could have been avoided. Specifically, Officer McCall, in concert with Officer Cornwell, engaged in a course of conduct they knew, or should have known, would precipitate a violent and deadly confrontation. [Aveni Aff. at ¶ 6].

*Id.* at 20 (emphasis in the original).

As indicated, Plaintiffs rely upon *Allen v. Muskogee,* 119 F.3d 837 (10 th Cir.1997), to argue that McCall violated Wells' Fourth Amendment rights, based upon his actions prior to the time that Cornwell

shot him. In *Allen,* the Tenth Circuit held that the reasonableness of actions in an excessive force case against police officers must be judged both on whether the officers were in danger at the precise moment they used force and on "whether the Defendants' own reckless or deliberate conduct [prior to the use of deadly force] unreasonably created the need to use such force." *Id.* at 840. *Accord, Sevier v. City of Lawrence,* 60 F.3d 695 (10th Cir.1995). Since the Sixth Circuit has repeatedly rejected that approach, this Court concludes that Aveni's affidavit fails to raise a genuine issue of material fact concerning the question of whether McCall violated Wells' rights under the Fourth Amendment.

For instance, in *Dickerson v. McClellan,* 101 F.3d 1151 (6th Cir.1996), the Sixth Circuit addressed the question of whether events occurring prior to the alleged use of excessive force should be considered in the calculus concerning the reasonableness of the use of force. Therein, the plaintiffs sought to recover damages under § 1983 for the harm they suffered as a result of the death of their decedent, Joel Dickerson ("Dickerson"). The defendants, police officers, had responded to a dispatcher's call to the effect that nine shots had been fired by a drunk person. One of the officers met the woman who had made the call near the residence where the man firing the shots, Dickerson, was located. The woman confirmed that Dickerson remained inside and that he had fired at least nine shots. That officer did not ask the woman whether anyone else was inside the house. After the second officer had arrived and been briefed by the other on the situation, both of them approached the residence in which Dickerson was located. The front door was open, while the storm door was closed. Although the officers could see into the residence through the closed storm door, they did not see Dickerson or anyone else inside. They did, however, hear unintelligible screaming from a male

in the rear of the house. They then opened the storm door and entered the house, without knocking or otherwise announcing their presence. As the officers proceeded to the rear of the house, they heard Dickerson threaten them. Dickerson then charged out of the house, causing one of the officers to flee before him to find cover, while the other found cover in the rear of the house. Both officers then fired at Dickerson, killing him.

The Plaintiffs brought suit alleging that the officers had violated the Fourth Amendment, by failing to knock and announce themselves, before entering the residence, and by using excessive, deadly force to seize Dickerson. When ruling upon the defendants' appeal of the decision to deny their request for summary judgment on the basis of qualified immunity, the Sixth Circuit addressed, among other issues, the question of whether the failure of the officers to knock and to announce themselves, events antecedent to the fatal shooting of Dickerson, should be considered when deciding whether that shooting constituted the use of excessive force in violation of the Fourth Amendment. The Sixth Circuit answered that question in the negative, writing:

> Plaintiffs argue that the conduct preceding the shooting is relevant to the issue of the objective reasonableness of the force. Appellees' brief, at 43–45. To the extent plaintiffs argue that [the officers] should have investigated further before approaching Dickerson's house, we note that the Fourth Amendment does not require officers to use the best technique available as long as their method is reasonable under the circumstances. *See Collins v. Nagle,* 892 F.2d 489, 493 (6th Cir.1989). Plaintiffs also contend that the fact finder should consider all of the circumstances preceding the shooting in determining liability for excessive force under § 1983. Specifi-

cally, plaintiffs contend that the officers should be held accountable for creating the need to use excessive force by their unreasonable unannounced entry. The officers respond by posing the question whether a police officer who is negligent in performing some aspect of his pre-entry investigation "must allow an armed assailant to chase him out of the house and kill him because he created the emergency to which he had to react lethally." Appellants' brief, at 38.

The Supreme Court has instructed courts to look to the totality of the circumstances to determine whether the force used was reasonable. *Tennessee v. Garner*, 471 U.S. 1, 8–9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). Our present inquiry, however, is how broadly to view the circumstances relevant to the excessive force issue. Some of our cases analyze excessive force claims in segments. *See, e.g., Russo v. City of Cincinnati*, 953 F.2d 1036, 1044–45 (6th Cir. 1992) (analyzing three distinct excessive force claims raised by the plaintiffs separately even though they were part of one incident: the initial use of a taser, subsequent use of the taser, and the use of deadly force); *Pleasant v. Zamieski*, 895 F.2d 272, 276 (6th Cir.) (breaking down analysis of whether the officer's actions in arresting a suspect were objectively reasonable under the circumstances into two components: whether it was reasonable for the officer to decide (1) to draw his gun and (2) not to return his gun to its holster), *cert. denied*, 498 U.S. 851, 111 S.Ct. 144, 112 L.Ed.2d 110 (1990); *Yates*, 941 F.2d at 450 (Suhrheinrich, J., concurring) (cautioning against "lumping together conduct which was allegedly a fourth amendment violation for a warrantless search . . . with conduct giving rise to a fourth amendment excessive force claim" and stating that it does not "automatically follow [ ] that even if an officer's conduct was

legally objectively unreasonable with respect to a search, he cannot under any circumstances acquire qualified immunity for a subsequent constitutional violation."). *See also Sampson v. Gilmere*, 476 U.S. 1124, 1125, 106 S.Ct. 1993, 90 L.Ed.2d 673 (1986) (Burger, C.J., dissenting from the denial of a certiorari petition) (stating that "an officer's conduct which makes the need for deadly force more likely does not constitutionally disable the officer from later using deadly force to defend himself.").

Other circuits have applied similar analyses in excessive force cases. In *Carter v. Buscher*, 973 F.2d 1328, 1332–33 (7th Cir.1992), the court recognized that the Supreme Court begins its analysis by identifying the "seizure" and proceeding to examine

> whether the force used to effect that seizure was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create the circumstances. In *Brower*, for instance, the question on remand was whether it was reasonable to seize a fleeing suspect with a deadman roadblock, not whether it was reasonable to pursue the suspect in a high-speed car chase.

*Carter*, 973 F.2d at 1332 (citing *Garner*, 471 U.S. at 7–12, 105 S.Ct. 1694, and *Brower v. County of Inyo*, 489 U.S. 593, 599–600, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989)). As the Seventh Circuit stated in *Plakas v. Drinski*, 19 F.3d 1143, (7th Cir.), *cert. denied*, 513 U.S. 820, 115 S.Ct. 81, 130 L.Ed.2d 34 (1994):

> The time-frame is a crucial aspect of excessive force cases. Other than random attacks, all such cases begin with the decision of a police officer to do something, to help, to arrest, to inquire. If the officer had decided to do nothing, then no force would have

been used. In this sense, the police officer always causes the trouble. But it is trouble which the police officer is sworn to cause, which society pays him to cause and which, if kept within constitutional limits, society praises the officer for causing.

*Id.* at 1150. Therefore, the *Plakas* court stated that the appropriate method of analysis is to "carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage." *Id. See also Menuel v. City of Atlanta,* 25 F.3d 990, 997 (11th Cir.1994) (recognizing that "police must pursue crime and constrain violence, even if the undertaking itself causes violence from time to time" and holding that "[n]o responsible officer could disregard the palpable indications of imminent violence that pervaded the [suspect's] household"); *Drewitt v. Pratt,* 999 F.2d 774, 778–80 (4th Cir. 1993) (rejecting a claim that an officer who resorts to deadly force in self-defense nevertheless violates the Fourth Amendment if he unreasonably provokes the shooting by failing properly to identify himself as a police officer); *Cole v. Bone,* 993 F.2d 1328, 1333 (8th Cir.1993) ("scruteniz[ing] only the seizure itself, not the events leading to the seizure, for reasonableness under the Fourth Amendment" because the "Fourth Amendment prohibits unreasonable seizures, not unreasonable or ill-advised conduct in general."); *Greenidge v. Ruffin,* 927 F.2d 789, 792 (4th Cir.1991) (holding that Graham's objective reasonableness test for excessive use of deadly force requires the factfinder to focus on

the very moment the officers make the "split-second judgments" and not on the events leading up to the time immediately prior to a shooting); *Sherrod v. Berry,* 856 F.2d 802, 805–06 (7th Cir.1988) (en banc) (stating that in an excessive force case courts should look to the split second before the officer had to decide what to do).

*Id.* at 1160–1162. *Accord, Boyd v. Baeppler,* 215 F.3d 594 (6th Cir.2000); *Whitlow v. City of Louisville,* 39 Fed.Appx. 297, 2002 U.S.App. Lexis 13357 (6th Cir.2002).

On the basis of *Dickerson* and the cases cited therein, this Court concludes that Fourth Amendment liability cannot be imposed on McCall for the events preceding the shooting of Wells. Since the Plaintiffs do not contend that McCall used excessive force against Wells or even seized him, the Court concludes that McCall is entitled to summary judgment on Plaintiffs' claim under the Fourth Amendment.[16]

 Plaintiffs also seek to impose tort liability upon McCall under the Ohio common law. Under § 2744.03(A)(6)(b) of the Ohio Revised Code, an employee of a political subdivision, such as McCall, can be held liable, only if his "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner."[17] An employee of a political subdivision acts with a "malicious purpose," when he acts with the willful and intentional design to do injury, or the intention or desire to harm another, usually seriously, through unlawful or unjustified conduct. *Schoenfield v. Navarre,* 164 Ohio App.3d 571, 577, 843 N.E.2d 234, 239 (2005). "Bad faith"

16. Moreover, there is no evidence that, prior to the shooting, any act of McCall's violated the Fourth Amendment rights of Wells and/or Robinson.

17. Under § 2744.03(A)(6)(a) and (c), liability can also be imposed upon such an employee,

if he has acted manifestly outside the scope of his employment or because liability is expressly imposed by another provision of the Ohio Revised Code. Since the Plaintiffs have not argued that § 2744.03(A)(6)(a) and/or (c) is applicable in this litigation, this Court does not discuss them further.

implies more than mere bad judgment or negligence; rather, it connotes a " 'dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud.' " *Id.* (quoting *Jackson v. McDonald,* 144 Ohio App.3d 301, 309, 760 N.E.2d 24, 29 (2001)). An employee of a political subdivision acts in a reckless or wanton manner when he perversely disregards a known risk, or acts or intentionally fails to act in contravention of a duty, knowing or having reason to know of facts which would lead a reasonable person to realize such conduct creates an unreasonable risk of harm substantially greater than the risk necessary to make the conduct negligent. *Webb v. Edwards,* 165 Ohio App.3d 158, 166, 845 N.E.2d 530, 536 (2005); *Fowler v. Williams Cty. Commrs.,* 113 Ohio App.3d 760, 775, 682 N.E.2d 20, 29–30 (1996).

There is neither evidence nor argument that McCall acted with a malicious purpose or in bad faith, as those terms have been defined by Ohio courts. Therefore, the question becomes whether the evidence raises a genuine issue of material fact that he acted in a reckless or wanton manner. Construing the evidence most favorably to the Plaintiffs, McCall responded to a request from Cornwell for backup at Robinson's apartment at 104 Central Avenue. After McCall and Cromwell had positioned themselves outside that apartment in locations where they could not be seen through the door's peephole, Cornwell knocked on the door twice, without either officer identifying himself as a police officer. After Robinson had shot Cornwell, McCall tried to see inside through the cutting the pie maneuver. As with their

claim under § 1983, the Plaintiffs rely upon the statements contained in Aveni's affidavit, in order to demonstrate that a genuine issue of material fact exists on the question of whether McCall acted in a reckless or wanton manner. As is indicated above, Aveni states that McCall and Cornwell engaged in a course of conduct which they knew or should have known would precipitate a violent and deadly confrontation.[18] Although Aveni has not specifically identified the course of conduct to which he has referred, the Court proceeds under the assumption that it is comprised of the shortcomings of McCall which the Plaintiffs' expert witness identified in his affidavit. Those include McCall's failure to identify himself and to announce the purpose of his visit, his failure to treat the state of affairs at Robinson's apartment as a barricaded gunman (hostage) situation and his decision to look inside the apartment after Cornwell had been shot. Simply stated, even if a reasonable juror could find that McCall was negligent in that regard, such a juror could not find that he perversely disregarded a known risk, or acted or intentionally failed to act in contravention of a duty, knowing or having reason to know of facts which would lead a reasonable person to realize such conduct created an unreasonable risk of harm substantially greater than the risk necessary to make the conduct negligent. Therefore, McCall is entitled to summary judgment on Plaintiffs' state law claims.

Accordingly, the Court sustains in its entirety the branch of the Motion for Summary Judgment filed by Dayton, McManus, Cornwell and McCall (Doc. # 17), with which they seek summary judgment on Plaintiffs' claims against McCall.

18. In ¶ 9 of his affidavit, Aveni states in conclusory fashion that the actions of McCall and Cornwell were reckless. However, the Sixth Circuit has repeatedly stated that the conclusory statement of an expert in his affidavit does not create a genuine issue of material fact. *See e.g., Black v. Roadway Express Inc.,* 297 F.3d 445, 454–55 (6th Cir.2002). Therefore, this Court concludes that Aveni's conclusory statement in that regard does not create a genuine issue of material fact on the question of whether McCall acted recklessly.

### 3. Request for Summary Judgment by Cornwell

■ Defendants seek summary judgment on Plaintiffs claims against Cornwell, under both federal and state law. As a means of analysis, the Court initially discusses the parties' arguments concerning the Plaintiffs' federal claim under § 1983 and the Fourth Amendment, following which it will turn to their respective assertions concerning the state law claims.

The Defendants argue that Cornwell is entitled to summary judgment on Plaintiffs' § 1983 claim, in accordance with the defense of qualified immunity. In *Wilson v. Layne*, 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999), the Supreme Court restated the analytical framework that is applied to any claim of qualified immunity.

> A court evaluating a claim of qualified immunity "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Conn v. Gabbert*, 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999).

*Id.* at 608, 119 S.Ct. 1692. This Court addresses those two questions in the order set forth by the Supreme Court.

In the context of a claim of qualified immunity in a case arising out of the alleged use of excessive force in violation of the Fourth Amendment, the Supreme Court explained:

> When confronted with a claim of qualified immunity, a court must ask first the following question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S., at 201, 121 S.Ct. 2151, 150 L.Ed.2d 272. As the Court of Appeals recognized, the

constitutional question in this case is governed by the principles enunciated in *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), and *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

*Brosseau v. Haugen*, 543 U.S. 194, 197, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004). In *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Supreme Court held that all claims of the use of excessive force arising out of seizures are to be judged under the objective reasonableness test of the Fourth Amendment. The *Graham* Court explained:

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' " against the countervailing governmental interests at stake. [*Tennessee v. Garner*, 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) ], quoting *United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. See *Terry v. Ohio*, 392 U.S. [1, 22–27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1969) ]. Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest

by flight. See *Tennessee v. Garner*, 471 U.S. at 8–9, 105 S.Ct. 1694 (the question is "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure").

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. See *Terry v. Ohio*, supra, 392 U.S., at 20–22, 88 S.Ct. 1868. The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested, *Hill v. California*, 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971), nor by the mistaken execution of a valid search warrant on the wrong premises, *Maryland v. Garrison*, 480 U.S. 79, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987). With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," *Johnson v. Glick*, 481 F.2d [1028, 1033, *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973) ], violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. See *Scott v. United States*, 436 U.S. 128, 137–139, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978); see also *Terry v. Ohio*, supra, 392 U.S., at 21, 88 S.Ct. 1868 (in analyzing the reasonableness of a particular search or seizure, "it is imperative that the facts be judged against an objective standard"). An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional. See *Scott v. United States*, supra, 436 U.S., at 138, 98 S.Ct., at 1723, citing *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973).

*Id.* at 396–97, 109 S.Ct. 1865

■ Herein, in moving for summary judgment, the Defendants have construed the evidence in the manner most favorable to Cornwell, rather than in the manner most favorable to the Plaintiffs, the parties against whom summary judgment is sought, as required when ruling on a motion for summary judgment. Most importantly, in setting forth the details of the fatal confrontation between Cornwell and Wells,[19] the Defendants have relied exclusively upon Cornwell's deposition testimony, ignoring the sworn statements given by Veney and West, who, along with Cornwell, witnessed that confrontation.[20]

---

**19.** As it did with McCall, the Court concludes that the events preceding that confrontation cannot be considered in the Fourth Amendment calculus.

**20.** The sworn statements were the answers of Veney and West to questions by Plaintiffs' counsel, given before a court reporter after each had been placed under oath. The sworn statements were much like depositions, except that Defendants' counsel was not present to participate and to cross-examine those giving the statements. However, the *ex parte* nature of the statements does not disqualify them from consideration in ruling on the Defendants' Motion for Summary Judgment (Doc. # 17). *See Bozeman v. Orum*, 422 F.3d 1265, 1267–68 n. 1 (11th Cir.2005) (rejecting the

Above, this Court has concluded that, construing the evidence in the manner most favorable to Plaintiffs, Wells did not present a risk of harm to either officer or to anyone else. His hands were empty and were not in his pockets. He did not possess a weapon, nor did he approach Cornwell in a threatening manner or otherwise. He made no threatening gestures, and did not say anything which could have caused Cornwell to fear for his or anyone else's safety. Based upon the evidence before the Court, the jury could find that Cornwell moved into the doorway after McCall had pushed the door open and instinctively shot the first individual he saw, even though that individual was unarmed and presented no risk of harm to anyone.[21] Moreover, Cornwell fired those shots without affording the individual any opportunity of surrendering.

Applying the three factors identified by the Supreme Court in *Graham* ("the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight"), as being central to the reasonableness calculation, the jury could find that Cornwell violated Wells' rights under the Fourth Amendment by using excessive force to seize him. Although the crime which had occurred, the shooting of Cornwell, was very serious, he had no information indicating that Wells had been the perpetrator of that crime, other than the fact that he was in the apartment. That, however, is a thin reed upon which to rely, given that Cornwell was aware that there were multiple males inside that apartment. In addition, Wells did not pose an immediate threat to the safety of Cornwell or anyone else. Moreover, he was not resisting arrest or attempting to flee.

Based upon the foregoing, the Court concludes that the evidence raises a genuine issue of material fact on the question of whether Cornwell used excessive force, in violation of the Fourth Amendment, when he shot Wells.[22] Therefore, the Court turns to the question of whether the right upon which Plaintiffs rely was clearly established.

In *Brosseau*, the Supreme Court restated the analytical framework that is applicable to the second step of the qualified immunity inquiry:

> Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted. *Saucier v. Katz*, 533 U.S. [194, 206, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)] (qualified immunity operates "to protect officers from the sometimes 'hazy border between excessive and acceptable force' "). Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct. If

argument that a sworn statement should be disregarded in ruling on a motion for summary judgment, because it was given *ex parte* and noting that "[s]worn statements given before court reporters are at least as reliable as signed affidavits and are properly considered on summary judgment").

**21.** It bears emphasis that Cornwell knew that there was more than one individual inside the apartment, even before he had been shot, given that he and McCall testified during their

depositions that they heard multiple male voices inside the apartment when they initially listened at the door. Moreover, there is no evidence that the officers had reason to believe that anyone other than the drunken Robinson had been involved in the incident with Smith, which had brought them to 104 Central Avenue.

**22.** In reaching that conclusion, the Court has not relied upon the statements contained in Aveni's affidavit.

the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.

It is important to emphasize that this inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.*, at 201, 121 S.Ct. 2151. As we previously said in this very context:

"[T]here is no doubt that *Graham v. Connor, supra,* clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. Yet that is not enough. Rather, we emphasized in *Anderson [v. Creighton,]* 'that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' 483 U.S. [635,] 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 [ (1987) ]. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*, at 201–202, 121 S.Ct. 2151.

543 U.S. at 198–99, 125 S.Ct. 596.

In arguing that the right upon which the Plaintiffs rely was not clearly established, the Defendants once again construe the evidence in the manner most favorable to Cornwell, ignoring the sworn statements of Veney and Wilson. Construing the evidence in the manner most favorable to the Plaintiffs, however, this Court concludes that this right was clearly established when Cornwell shot Wells. In particular, the Plaintiffs argue that it has been long established that a police officer may not use excessive force to seize someone who does not pose a risk of harm to the officer or to anyone else. As is indicated above, construing the evidence in the manner most favorable to the Plaintiffs, the Court concludes that the jury could find that Wells did not pose a risk of harm to Cornwell or to anyone else, when Cornwell confronted the decedent through the open door to Robinson's apartment. On the contrary, the jury could find that Cornwell, having been shot, merely shot the first person he saw inside the apartment from which the bullet that hit his body armor had been fired.

Although the Plaintiffs have not cited a decision that is on "all fours" with the evidence in this case, the Supreme Court has acknowledged that officials can be on notice that their conduct violates clearly established law even under novel factual circumstances. *Hope v. Pelzer,* 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). Under analogous circumstances, the Sixth Circuit has concluded that it is clearly established that police may not use deadly force to seize an individual who does not pose a risk of harm to the officers or to anyone else. For instance, in *Ciminillo v. Streicher,* 434 F.3d 461 (6th Cir. 2006), the Sixth Circuit held that it was clearly established in May, 2002, that an officer could not shoot an individual with a beanbag during a riot, when the individual had committed no crime, was unarmed and whose conduct did not suggest that he posed a threat to anyone. Moreover, in *Russo v. City of Cincinnati,* 953 F.2d 1036 (6th Cir.1992), the Sixth Circuit addressed qualified immunity in the context of an excessive, deadly force claim arising out of the shooting death of a paranoid schizophrenic, armed only with knives, who was suicidal and homicidal. Three police officers had shot him 23 times, in three rounds of firing. The Sixth Circuit con-

cluded that it was clearly established that the officer could not continue to shoot the suspect in the second and third rounds of firing, because he had been disabled during the first and, therefore, did continue to pose a threat.

Accordingly, the Court concludes that Cornwell is not entitled to summary judgment on Plaintiffs' § 1983 claim against him.

Plaintiffs have set forth state law claims of negligent and intentional infliction of emotional distress and assault and battery against Cornwell. They also seek to recover punitive damages from him under state law.

■ *First,* with respect to the assault and battery claim, the Defendants argue that Cornwell is entitled to immunity under § 2744.03(A)(6)(b), which is discussed above. Simply stated, the evidence reviewed above causes this Court to conclude that it raises a genuine issue of material fact as to whether Cornwell acted in a reckless or wanton manner.

■ *Second,* with respect to the claim of negligent infliction of emotional distress, the Court agrees with the Defendants that such a claim is reserved for those who are in the vicinity of an event, rather than for the victims of the event. Thus, a mother who sees her child hit by a car may recover under a theory of negligent infliction of emotional distress, while the child, the victim, is limited to recovering for emotional harm as an element of her general damages. *See e.g., Schultz v. Barberton Glass Co.,* 4 Ohio St.3d 131, 447 N.E.2d 109 (1983) (abrogating the contemporaneous physical injury rule and recognizing a claim for negligent infliction of emotional distress). Therefore, Cornwell is entitled to summary judgment on the Plaintiffs'

negligent infliction of emotional distress claim.

■ *Third,* Defendants argue that Cornwell is entitled to summary judgment on the intentional infliction of emotional distress claim, because the evidence fails to raise a genuine issue of material fact as to whether he used excessive force in violation of the Fourth Amendment and that, therefore, there is not a fact question as to whether he acted in an extreme and outrageous manner.[23] *See* Doc. #17 at 29. Since the Court has concluded that the evidence does raise a genuine issue of material fact as to whether Cornwell's actions violated the Fourth Amendment, the Court concludes that he is not entitled to summary judgment on this claim.

■ *Fourth,* Cornwell is not entitled to summary judgment on Plaintiffs' request for punitive damages under state law. In *Preston v. Murty,* 32 Ohio St.3d 334, 512 N.E.2d 1174 (1987), the Ohio Supreme Court held in the syllabus:

> Actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.

*Id.* Herein, the Court concludes that there is a genuine issue of material fact as to whether Cornwell acted with a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm. When Cornwell confronted him, Wells was unarmed; his hands were out of his pockets and empty, and he did not present a risk of harm to either officer or to anyone else. He did

---

**23.** That the alleged tortfeasor acted in an extreme and outrageous manner is a predicate for a claim of intentional infliction of emo-

tional distress. *Yeager v. Local Union 20,* 6 Ohio St.3d 369, 453 N.E.2d 666 (1983) (syllabus).

not approach Cornwell in a threatening manner or otherwise. He made no threatening gestures, and did not say anything which could have caused Cornwell to fear for his or anyone else's safety. Thus, the jury could find that Cornwell moved into the doorway after McCall had pushed the door open and instinctively shot the first individual he saw, even though that individual was unarmed and presented no risk of harm to anyone.

Accordingly, the Court sustains in part and overrules in part the Motion for Summary Judgment filed by Dayton, McManus, Cornwell and McCall (Doc. # 17), as it relates Cornwell. That motion is sustained as it relates to Plaintiffs' claim of negligent infliction of emotional distress and otherwise overruled.

Finally, the Court overrules, without prejudice to renewal, the Defendants' Motion for Summary Judgment (Doc. # 17), as it relates to the Plaintiffs' claims against Dayton. This Court has bifurcated the claims against Dayton, from those against the other individuals. *See* Doc. # 69. In the unlikely event that the trial of Plaintiffs' claims against Cornwell does not resolve their claims against Dayton, the Court will afford Dayton an adequate opportunity to renew its motion. However, given the unlikelihood that the trial of Plaintiffs' claims against Cornwell will not resolve their claims against Dayton, to rule on Dayton's request at this point would be akin to giving an advisory opinion. This Court is, of course, not permitted to render advisory opinions. *Arnett v. Myers,* 281 F.3d 552, 562 (6th Cir.2002).

As a result of the foregoing, the following claims remain to be resolved herein, to wit: 1) the Plaintiffs' federal law claims and state law claims, other than their claim for negligent infliction of emotional distress, against Cornwell; 2) their claims against Dayton; and 3) their negligence claim against Robinson.[24]

---

**24.** Plaintiffs' wrongful death claim under Ohio law, the Seventh Claim for Relief in their Complaint, is also pending. However, Ohio's wrongful death statute, § 2125.01 of the Ohio Revised Code, is remedial in nature, allowing the executor or administrator of an estate to file an action on behalf of the surviving spouse, children, parents and other next-of-kin of the decedent. That statute does not establish a new or different theory of recovery. Therefore, the Seventh Claim for Relief does not constitute a separate cause of action or claim to be submitted to the jury.